IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| MAGNOLIA VALLEY PLANTATION, LLC, | ) |
| MAGNOLIA VALLEY, LLC, AND | ) |
| MAGNOLIA HILLS, LLC | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), ("Plaintiff") files this complaint and

alleges as follows:

NATURE OF THE ACTION

1.      This is a civil action brought pursuant to Clean Water Act ("CWA" or the "Act")

Sections 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d), against Magnolia Valley Plantation, LLC

("Magnolia Valley Plantation"), Magnolia Valley, LLC ("Magnolia Valley"), and Magnolia

Hills, LLC ("Magnolia Hills") (collectively, "Defendants"[1]) for (1) the failure to comply with

terms and conditions of applicable General Permits[2] issued by the State of Georgia pursuant to

---

[1] For purposes of this Complaint, "Defendants" will refer to Magnolia Valley Plantation, Magnolia Valley and/or
Magnolia Hills.

[2] "General Permits" refers to the Authorization to Discharge under the National Pollutant Discharge Elimination
System Storm Water Discharges Associated with Construction Activity for Common Developments (Permit No.
GAR100003), effective August 1, 2008 ("2008 General Permit") and the reissued Authorization to Discharge under
the National Pollutant Discharge Elimination System Storm Water Discharges Associated with Construction
Activity for Common Developments (Permit No. GAR100003), effective September 24, 2013 ("2013 General
Permit").

CWA Section 402, 33 U.S.C. § 1342, for discharges of pollutants in storm water from a construction site; and (2) violations of CWA Section 301, 33 U.S.C. § 1311, for the discharge of pollutants into waters of the United States without permits issued pursuant to CWA Section 404, 33 U.S.C. § 1344. The allegations in this Complaint concern Defendants' activities at a residential development site located in Evans, Columbia County, Georgia.

2.      In this action, the United States seeks: (1) to enjoin the discharge of pollutants into waters of the United States without a permit in violation of CWA Section 301(a), 33 U.S.C. § 1311(a); (2) to require Defendants to comply with the requirements of the CWA and its implementing regulations and applicable General Permits; (3) to require Defendants, at their own expense and at the direction of EPA, to restore the affected waters of the United States and otherwise mitigate the environmental harm they have caused; and (4) to require Defendants to pay civil penalties as provided in CWA Section 309(d), 33 U.S.C. § 1319(d).

<u>JURISDICTION AND VENUE</u>

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 33 U.S.C. § 1319(b).

4.      Venue is proper in this District pursuant to 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1391 and 1395 because Defendants Magnolia Valley Plantation, Magnolia Valley and Magnolia Hills are incorporated and/or conduct business in this District, and because the violations occurred in this District.

5.      Authority to bring this civil action is vested in the Attorney General of the United States, pursuant to Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

6.      Notice of the commencement of this action has been provided to the State of Georgia pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b).

<u>DEFENDANTS</u>

7.     Defendant Magnolia Valley Plantation is a limited liability company organized and existing under the laws of the State of Georgia. Its principal place of business is located in Evans, Georgia. Magnolia Valley Plantation is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

8.     Defendant Magnolia Valley is a limited liability company organized and existing under the laws of the State of Georgia. Its principal place of business is located in Evans, Georgia. Magnolia Valley is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

9.     Defendant Magnolia Hills is a limited liability company organized and existing under the laws of the State of Georgia. Its principal place of business is located at the same address as Magnolia Valley Plantation, in Evans, Georgia. Magnolia Hills is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

10.     This action relates to violations alleged to have occurred beginning in April 29, 2012 at a residential development site located off of William Few Parkway, in Evans, Columbia County, Georgia (hereafter, the "Site").

11.     At all times relevant to the Complaint, one or more of the Defendants owned, operated, or otherwise controlled the Site.

12.     The Site is being developed in phases by one or more of the Defendants.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

A.     <u>General Statutory and Regulatory Authority</u>

13.     The CWA is designed to restore and maintain the chemical, physical, and biological integrity of the nation's waters. 33 U.S.C. § 1251(a).

3

14.     To accomplish the objectives of the Act, CWA Section 301(a), 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" to waters of the United States, except, *inter alia*, in compliance with a permit issued pursuant to CWA Sections 402 or 404, 33 U.S.C. §§ 1342, 1344.

15.     CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharges of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

16.     CWA Section 502(6), 33 U.S.C. § 1362(6), defines "pollutant" to include, *inter alia*, dredged spoil, rock, sand, dirt, and biological materials.

17.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including territorial seas."

18.     "Waters of the state" (*i.e.*, Georgia "waters") are defined to include "any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, and all other bodies of surface or subsurface water, natural or artificial, lying within or forming a part of the boundaries of the state which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation." Ga. Code Ann. § 12-5-22.

19.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock . . . from which pollutants are or may be discharged," including any pipe, ditch, channel, conduit, or discrete fissure.

B.     NPDES Permits

20.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that EPA may issue to "persons" NPDES permits that authorize the discharge of any pollutant to navigable waters, but

only in compliance with Section 301 of the CWA, 33 U.S.C. § 1311, and such terms and conditions as EPA determines are necessary to carry out the provisions of the CWA.

21.     Section 402 of the CWA, 33 U.S.C. § 1342, further directs the Administrator to prescribe conditions for NPDES permits to assure compliance with the requirements of the CWA, including conditions on data and information collection, reporting and other such requirements as the Administrator deems appropriate.

22.     CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), requires a CWA Section 402 permit for storm water discharges associated with industrial activity.

23.     Pursuant to 40 C.F.R. § 122.26(b)(14)(x), industrial activity for which associated storm water discharges require a Section 402 permit includes construction activity that disturbs five acres or more of total land area. Construction activity includes "clearing, grading, and excavation."

24.     Pursuant to CWA Section 402(b), 33 U.S.C. § 1342(b), EPA may designate a state as the permitting authority for Section 402 permits. The State of Georgia, through the Georgia Environmental Protection Division ("GEPD"), is an authorized permitting authority.

25.     If a state NPDES program is approved pursuant to CWA Section 402(b), 33 U.S.C. § 1342(b), the Administrator of the EPA retains the authority to take enforcement action under CWA Section 309, 33 U.S.C. § 1319. CWA Section 402(i), 33 U.S.C. § 1342(i).

26.     Under CWA Sections 308 and 402, 33 U.S.C. §§ 1318 and 1342, EPA promulgated regulations relating to the control of storm water discharges at 40 C.F.R. § 122.26. Any state-authorized permitting authority must include such requirements in its NPDES permitting program. *See* 40 C.F.R. § 123.25.

27.     EPA may issue individual permits for a facility or general permits covering one or more categories of storm water discharges. *See* 40 C.F.R. § 122.28. Pursuant to 40 C.F.R. § 123.25, any authorized state permitting program may include provisions for general permits.

28.     Under EPA's regulations, any person who discharges or who proposes to discharge storm water associated with industrial activity or small construction activity is required to apply for an individual permit or to seek coverage under a promulgated storm water general permit. *See* 40 C.F.R. §§ 122.21(a), 122.26(c), 122.28, 123.25.

C.     Wetlands Permits

29.     CWA Section 404(a), 33 U.S.C. § 1344(a), authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters at specified disposal sites.

D.     Legal Remedies

30.     Under Sections 309 and 402(i) of the CWA, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority to enforce violations of state-issued CWA permits.

31.     CWA Section 309(b), 33 U.S.C. § 1319(b), authorizes the Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person is in violation of CWA Section 301, 33 U.S.C. § 1311, or is in violation of any NPDES permit condition or limitation in an NPDES permit issued under CWA Section 402, 33 U.S.C. § 1342.

32.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $37,500 per day for each violation which takes

place after January 12, 2009 through November 2, 2015, inclusive; $51,570 per day for each

violation occurring on or after November 2, 2015 and assessed on or after August 1, 2015

through January 14, 2017, inclusive; $52,414 per day for each violation occurring on or after

November 2, 2015 and assessed on or after January 15, 2017 through January 14, 2018,

inclusive; and $53,484 per day for each violation occurring on or after November 2, 2015, and

assessed after January 15, 2018, pursuant to the Federal Civil Penalties Inflation Adjustment Act

of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410), as amended by the Debt Collection

Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134)  and the Federal Civil

Penalties Inflation Adjustment Act Improvement Act of 2015 (28 U.S.C. § 2461 note; Pub. L.

114-74, Section 701). *See* 40 C.F.R. Part 19, 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg.

75346 (Dec. 11, 2008); and 78 Fed. Reg. 66643 (Dec. 6, 2013); 83 Fed. Reg. 1190 (Jan. 10,

2018).

<u>GENERAL ALLEGATIONS</u>

33.     Magnolia Valley Plantation, Magnolia Valley, and Magnolia Hills are all

"persons" within the meaning of CWA Section 502(5), 33 U.S.C. § 1362(5).

A.     <u>The Site</u>

34.     The Site is located off of William Few Parkway, 33.549° N latitude by 82.205° W

longitude, in Evans, Columbia County, Georgia. The Site is comprised of all or portions of the

Magnolia Valley Plantation, Magnolia Valley and/or Magnolia Hills residential development

sites.[3] The Site is just under 50 acres and contains 142 development plats marked for single-

family homes. *See* Exhibit A.

---

[3] The Magnolia Hills development was renamed Magnolia Valley at some point prior to December 23, 2013, when
Defendants applied for coverage under the reissued 2013 General Permit for this development.

35.     At all relevant times, Defendants owned and/or operated the Site. *See* 2013 General Permit, at 5-6; *see also* 40 C.F.R. §§ 122.2, 232.2.

36.     There are four unnamed tributaries of Uchee Creek which were affected by Defendants' activities at the Site. *See* Exhibit B, attached hereto.

B.      Applicable Permits

37.     On August 1, 2008, GEPD issued General Permit No. GAR100003, "Authorization to Discharge Under The National Pollutant Discharge Elimination System Storm Water Discharges Associated With Construction Activity For Common Developments" (hereafter, the "2008 General Permit"). The 2008 General Permit had an expiration date of July 31, 2013; however, pursuant to General Permit Part V.B. (Continuation of the Expired General Permit), the permit continued "in full force and effect" until a new permit took effect. GEPD re-issued General Permit No. GAR100003 on September 24, 2013 (hereafter, the "2013 General Permit"). The 2013 General Permit is set to expire on July 31, 2018.

38.     Under Georgia's 2013 General Permit, the owner and/or operator of a construction site for which construction activities have already begun prior to its issuance (*e.g.*, a construction site for which an Notice of Intent for Coverage under the General Permit ("NOI") was submitted under the 2008 General Permit) must submit a re-issuance NOI for the existing construction site under the 2013 General Permit within 90 days of its effective date. 2013 General Permit, at 9.

39.     Pursuant to the 2013 General Permit, "owner" is defined as the "legal title holder to the real property on which is located the facility or site where construction activity takes place." 2013 General Permit, at 6.

40.    "Operator" is defined by the 2013 General Permit as "the entity that has the primary day-to-day operational control of those activities at the facility [or construction site] necessary to ensure compliance with Erosion, Sedimentation and Pollution Control Plan and permit conditions." 2013 General Permit, at 5.

41.    The Federal Regulations implementing the NPDES program define "[o]wner or operator" as "the owner or operator of any 'facility or activity' subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

42.    "Facility or activity means any NPDES 'point source' or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

43.    Both the 2008 General Permit and the 2013 General Permit (together, "the General Permits") require the design, implementation and maintenance of an Erosion, Sedimentation and Pollution Control Plan (the "Plan"). The Plan must be retained onsite, or if not possible, at a readily available location, and include, at minimum, best management practices ("BMPs"), including "sound conservation and engineering practices to prevent and minimize erosion and resultant sedimentation." 2008 General Permit, at 17-18, 20; 2013 General Permit, at 17-18, 21.

44.    For "common development" sites, *i.e.* "contiguous areas where multiple, separate, and distinct construction activities will be taking place at different times on different schedules under one plan of development," a single Plan must be prepared by the primary permittee for all sites within the common development, and the Plan must address BMPs for all phases of the common development, regardless of who owns the individual sites within it. 2008 General Permit, at 4, 19; 2013 General Permit, at 4, 19.

9

45.     The NOI submitted by the owner and/or operator of a construction site pursuant to the General Permits must include, *inter alia*, certification that a Plan has been prepared and provides for compliance with the respective General Permit. 2008 General Permit, at 10-11; 2013 General Permit, at 10-11.

46.     For construction activities that commence after the effective date of the 2008 General Permit, but before the effective date of the 2013 General Permit, "the primary permittee must retain the design professional who prepared the [Plan] . . . to inspect the installation of the control measures (BMPs) which the design professional designed within seven (7) days after the initial construction activities commence[, or] [f]or construction activities where construction began on or before the effective date of this permit, . . . within seven (7) days after the Plan has been implemented." 2008 General Permit, at 17. As stated in the 2008 General Permit,

> the design professional shall determine if these BMPs have been installed and are being maintained as designed. The design professional shall report the results of the inspection to the primary permittee within seven (7) days and the permittee must correct all deficiencies within two (2) business days of receipt of the inspection report from the design professional unless weather related site conditions are such that additional time is required.

*Id.* The 2013 General Permit provides continuity for these construction activities, specifying that construction activities begun under the 2008 General Permit and subject to the 2013 General Permit shall continue to operate under their existing Plan. 2013 General Permit, at 20.

47.     The General Permits also mandate that the permittee

> shall amend their Plan whenever there is a change in design, construction, operation, or maintenance, which has a significant effect on BMPs with a hydraulic component . . . , if the Plan proves to be ineffective in eliminating or significantly minimizing pollutants from sources identified under Part IV.D.3 of this permit.

2008 General Permit, at 20-21; 2013 General Permit, at 21.

10

48.      In addition, the General Permits require the design, implementation and maintenance of BMPs to prevent or minimize pollution of waters of Georgia. 2008 General Permit, at 16; 2013 General Permit, at 17. These practices include measures to prevent erosion (by using soil stabilization and other preventative measures) and sediment capturing (by using silt fences, sedimentation basins, and other measures to capture sediment before it leaves the site).

49.      The BMPs "must be implemented in accordance with the design specifications contained in the 'Manual for Erosion and Sediment Control in Georgia' [hereafter, the 'Manual'] published by the State Soil and Water Conservation Commission as of January 1 of the year in which the land-disturbing activity was permitted," and the Plan must be consistent with, and no less stringent than, what is specified in the Manual. 2008 General Permit, at 16-17, 21; 2013 General Permit, at 17-18, 22.

50.      The Manual further sets forth specific conditions and requirements for the construction, operation and maintenance of BMPs to prevent erosion (by using soil stabilization and other preventative measures) and sediment capturing (by using silt fences, sedimentation basins, and other measures to capture sediment before it leaves the site). See, e.g., Manual, 5th Ed., at 59-255; Manual, 6th Ed., at 92-328.

51.      As noted in the 2013 General Permit, "[f]ailure to properly design, install, or maintain best management practices shall constitute a violation of [the applicable] permit for each day on which such failure occurs." 2013 General Permit, at 17.

52.      "If BMP failures are observed which have resulted in sediment deposition into Waters of the State, the permittee shall correct the BMP failures and shall submit a summary of the violations to [GEPD]." 2013 General Permit, at 17. In addition, turbidity samples must be

11

taken until the area attains the prescribed turbidity level or until inspectors determine that the BMP failures have been rectified. 2013 General Permit, at 32.

53.     Any permit violation must be documented within seven (7) days of the permittee's knowledge of the violation, and the permittee must submit a summary of the violation to GEPD within fourteen (14) days of the permittee's discovery of the violation. 2013 General Permit, at 34.

54.     As specified in the 2013 General Permit, a sediment basin providing 1800 cubic feet (67 cubic yards) per acre must be provided until the disturbed area undergoes final stabilization. When the sediment basin fills to about 22 cubic yards per acre, the sediment must be removed to restore the original volume. *See* 2013 General Permit, at 24.

55.     The 2013 General Permit also mandates that "no construction activities shall be conducted within a 25 foot buffer along the banks of all state waters, . . . [and the] buffer shall remain in its natural, undisturbed, state of vegetation until all land-disturbing activities on the construction site are completed." 2013 General Permit, at 19.

56.     As specified in the General Permits, the primary permittee must ensure that certified personnel conduct certain daily, weekly and post-qualifying rain event (*i.e.* "within 24 hours of the end of a storm that is 0.5 inches rainfall or greater") inspections, and the primary permittee must maintain inspection reports summarizing the inspections and identifying any non-compliance. 2008 General Permit, at 24-25; 2013 General Permit, at 25-26.

57.     Furthermore, the 2013 General Permit requires the permittee to "take all reasonable steps to minimize or prevent any discharge in violation of [the applicable] permit which has a reasonable likelihood of adversely affecting human health or the environment." 2013 General Permit, at 35.

C.     <u>General Permit Coverage</u>

58.     On February 14, 2011, Defendants submitted an NOI for coverage under the 2008 General Permit for the Magnolia Hills development, which includes the northern and northwestern portions of the Site (hereafter "February 2011 Magnolia Hills NOI"). *See* Exhibit A, at 6. Pursuant to Part I.D.2 of the 2008 General Permit, Defendants were authorized for coverage under the permit on or before February 28, 2011.

59.     On September 29, 2011, Defendants submitted a notice of intent for coverage under the 2008 General Permit for the "Magnolia Plantation" development (hereafter "September 2011 Magnolia Valley Plantation NOI"). Upon information and belief, this is the Magnolia Valley Plantation development, which includes the southern and southeastern portion of the Site. *See* Exhibit A, at 2. Pursuant to Part I.D.2 of the 2008 General Permit, Defendants were authorized for coverage under the permit on or before October 13, 2011.

60.     On December 23, 2013, Defendants submitted a notice of intent for coverage under the reissued 2013 General Permit for the Magnolia Valley (f/k/a Magnolia Hills) development (hereafter "December 2013 Magnolia Hills NOI"). Pursuant to Part I.D.2 of the 2013 General Permit, Defendants were authorized for coverage under the permit on or before January 6, 2014.

61.     On December 23, 2013, Defendants submitted a notice of intent for coverage under the reissued 2013 General Permit for the Magnolia Plantation development (a/k/a Magnolia Valley Plantation) (hereafter "December 2013 Magnolia Valley Plantation NOI"). Pursuant to Part I.D.2 of the 2013 General Permit, Defendants were authorized for coverage under the permit on or before January 6, 2014.

D.      NPDES Permit Violations

62.      EPA performed Compliance Stormwater Evaluation Inspections of the Site on

April 23, 2014 and November 17, 2014. During both visits, EPA observed violations of the

CWA, the 2013 General Permit, the Manual and the Plan on file at the time of the inspections.

     (i)      *Violations Observed During the April 23, 2014 Inspection*

63.      At the time of the April 2014 inspection, the Site had been under a stop work

order from Columbia County since December 31, 2013.

64.      At the time of inspection the Site was between the initial and intermediate stages

of construction.

65.      The most current Plan available was for the intermediate stage of construction and

was dated March 10, 2014 (hereafter "March 2014 Intermediate Plan"). The Plan was not

available onsite. The United States also reviewed the most current plan for the initial phase of

construction, dated February 20, 2014 (hereafter "Feb. 2014 Initial Plan").

66.      During the April 2014 Site inspection, EPA observed a number of BMPs that

were present but not incorporated into either the Feb. 2014 Initial Plan or the March 2014

Intermediate Plan (together, for purposes of this Subsection E.(i), "Plans"). *See* Exhibit C.

67.      EPA also observed several BMPs that either were indicated on the Plans and not

installed at the Site or, though indicated on the Plans, were installed improperly and/or

inadequately maintained, in contravention with the Manual and the approved Plans, including,

*inter alia*, storm drain inlets, silt fencing, stabilization, seep berms and stockpiled soil. *See*

Exhibit C.

68.      Additionally, EPA observed sediment deposition downstream of one of the seep

berms and along the length of a tributary of Uchee Creek that originates in the northern section

of the Site, and into the junction of the tributary with Uchee Creek. *See* Exhibit B, tributary segment S1.

69. The BMP deficiencies and failures that EPA observed during the April 2014 inspection, *see, e.g.*, paragraphs 66 through 68 above & Exhibit C, were documented by EPA in an inspection report that was presented to Defendants. Upon information and belief, Defendants did not report the BMP failures to GEPD within fourteen (14) days of discovering them.

*(ii)    Violations Observed During the November 17, 2014 Inspection*

70. At the time of the November 2014 inspection, the Site was in the intermediate stage of construction. The roads were in place, but vertical construction had not yet commenced.

71. At the time of inspection, there were several plans in place, depending on the different phases of construction that took place during the intermediate stage of construction, including Intermediate Plan 8A, dated July 8, 2014; Intermediate Plan 8B, dated July 9, 2014; Revised Plan 4, dated July 9, 2014; Revised Plan 5, dated July 9, 2014; Revised Initial Plan 7, dated July 9, 2014; and Revised Final Plan 9, dated August 13, 2014 (together, for purposes of this Subsection E.(ii), "Plans").

72. During the inspection, EPA observed several BMPs at the Site which, upon information and belief, did not conform with the Manual and the approved Plans, including, *inter alia*, improperly installed and/or maintained BMPs, insufficient stabilization at numerous locations within the Site, insufficient sediment storage capacity, discharges from outfalls associated with controls that were no longer in place at the Site, and significant amounts of sediment deposition in the tributary from the Site. EPA also observed unpermitted clearing activities. *See* Exhibit C.

73.     Additionally, EPA observed a significant amount of sinking around several storm drains, a significant amount of sediment in the water inside a number of storm drain inlet pipes, and sediment-filled water discharging from the outlet protection around outfall from the pipes and into the tributary of Uchee Creek. *See* Exhibit B, "S1" tributary segment. EPA also observed channeling, storm water runoff containing significant sedimentation, and accumulated sedimentation at several areas of the Site, including storm drain inlets and associated storm drain outfalls; the road which runs north-south through the Site; and the cul-de-sac at the south end of the Site.

74.     The BMP deficiencies and failures that EPA observed during the November 2014 inspection, *see, e.g.*, paragraphs 72 through 73 above & Exhibit C, were documented by EPA in an inspection report that was presented to Defendants. Upon information and belief, Defendants did not report the BMP failures to GEPD within fourteen (14) days of discovering them.

*(iii)     Additional Storm Water Violations*

75.     Upon information and belief, most, if not all, daily inspection logs, were not signed by an individual with the required certification for performing these inspections. Furthermore, upon information and belief, Defendants retained a person who had the necessary certification to perform these inspections; however, this person was not present at the Site on a daily basis. Additionally, upon information and belief, Defendants failed to log, or failed to perform, daily inspections for the majority of the days between April 29, 2012 through June 27, 2014.

76.     Upon information and belief, routine weekly inspections were not performed until April 2014.

77. Upon information and belief, qualifying rain event inspections (*i.e.* inspections within 24 hours of the end of a storm of 0.5 inches or greater) were not performed at various dates between July 2012 and April 2014. Additionally, upon information and belief, Defendants only performed and/or documented turbidity sampling for March 2, 2012 and April 4, 2012.

78. Furthermore, although upon information and belief, BMP failures occurred which resulted in sediment discharges to the tributaries, Defendants' inspection reports for the inspections that were performed do not document BMP failures.

79. Upon information and belief, Defendants failed to have the design professional who prepared the Plan (or an alternative design professional approved by GEPD) timely inspect the installation of BMPs that the professional designed.

F.    Unauthorized Discharges of Dredged and/or Fill Material

80. In March 2014 and October 2014, EPA inspected the Site for violations of CWA Section 404. This investigation demonstrated that Defendants discharged dredged or fill material into waters of the United States without a permit under CWA Section 404 at the Site.

81. The dredged or fill material that Defendants and/or persons acting on their behalf, caused to be discharged includes, among other things, dirt, spoil, rock and sand, all of which constitute "pollutants" as defined in CWA Section 502(6), 33 U.S.C. § 1362(6).

82. Defendants and/or persons acting on their behalf used mechanized land-clearing and/or earth-moving equipment to accomplish the discharges of pollutants at the Site. This equipment constitutes "point sources" as defined in CWA Section 502(14), 33 U.S.C. § 1362(14).

83. The discharge of pollutants into wetlands and streams at the Site occurred in the course of the construction of residential development.

17

84.     The wetlands and streams at the Site into which pollutants were discharged are waters of the United States. The streams at the Site were perennial or intermittent tributaries of Uchee Creek, which is a perennial tributary of the Savannah River. The Savannah River is a traditional navigable water because it is currently used, was used in the past, or may be susceptible to use in interstate or foreign commerce.

85.     The former wetlands at the Site into which pollutants were discharged had a continuous surface connection with the former streams at the Site.

86.     The former wetlands and streams at the Site, either alone or in combination, significantly affect the chemical, physical and biological integrity of traditionally navigable waters.

87.     At all times relevant to this Complaint, the former wetlands and streams at the Site each constituted "waters of the United States" and "navigable waters" under CWA Section 502(7), 33 U.S.C. § 1362(7).

88.     Defendants did not obtain a permit from the Secretary of the Army, acting through the Chief of Engineers, for the discharges of dredged or fill material into waters of the United States as required by CWA Sections 301(a) and 404, 33 U.S.C. §§ 1311(a), 1344.

89.     One or more of the Defendants owned or otherwise controlled the Site where each unauthorized discharge of dredged or fill material into waters of the United States occurred.

90.     Defendants conducted, contracted for, supervised, and/or otherwise controlled the unauthorized activities described in this Complaint.

91.     Defendants are persons within the meaning of CWA Section 502(5), 33 U.S.C. § 1362(5).

92.     Defendants have violated and continue to violate CWA Section 301(a), 33 U.S.C. § 1311(a), by their unauthorized discharges of dredged or fill material into waters of the United States at the Site.

93.     Each day that such material remains in place constitutes a separate violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

94.     Unless enjoined, Defendants are likely to continue to discharge dredged or fill material into and/or to allow dredged or fill material to remain in Uchee Creek, its tributaries, and the former wetland.

FIRST CLAIM FOR RELIEF
(Failure to Comply with Permit)

95.     The allegations contained in paragraphs 1 through 94 are re-alleged and incorporated herein by reference.

96.     As stated in more detail above, Defendants failed to comply with the terms and conditions of the applicable General Permits by, *inter alia*, (i) failing to properly design and implement a Plan; (ii) failing to amend the Plan as necessary; (iii) failing to properly design, implement and maintain adequate BMPs, including erosion control measures; (iv) failing to document and submit a summary to the GEPD for BMP failures resulting in sediment deposition into waters of the State; (v) failing to have certified personnel conduct daily site inspections; (vi) failing to perform all of the necessary weekly and qualifying rain event inspections; (vii) failing to have the design professional who prepared the Site's Plan timely inspect the installation of the BMPs; and (viii) failing to take all reasonable steps to minimize or prevent discharges which were likely to have adverse effects on human health and the environment. *See* ¶¶ 66-69, 72-79 & Exhibit C.

19

97.     Defendants discharged pollutants in storm water from the Site to intermittent or perennial tributaries to Uchee Creek, and therefore "waters of the United States" within the meaning of the CWA and the federal regulations promulgated thereunder, in violation of the terms and conditions of applicable General Permits and CWA Section 301, 33 U.S.C. § 1311.

98.     Unless enjoined, the violations will continue or will recur at other construction sites.[4]

99.     Pursuant to CWA Section 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d), the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015, 28 U.S.C. § 2461, Defendants are liable for injunctive relief and civil penalties of up to $37,500 per day for each such violation which takes place after January 12, 2009 through November 2, 2015, inclusive; $51,570 per day for each violation occurring on or after November 2, 2015 and assessed on or after August 1, 2015 through January 14, 2017, inclusive; $52,414 per day for each violation occurring on or after November 2, 2015 and assessed on or after January 15, 2017 through January 14, 2018, inclusive; and $53,484 per day for each violation occurring on or after November 2, 2015, and assessed after January 15, 2018.

SECOND CLAIM FOR RELIEF
(Unauthorized Discharges of Dredged and/or Fill Materials)

100.     The allegations contained in paragraphs 1 through 99 are re-alleged and incorporated herein by referenced.

101.     Defendants and/or persons acting on their behalf, or with Defendants' consent and/or knowledge, used mechanized land-clearing equipment and/or earth-moving equipment to discharge dredged and/or fill material in and around the Site.

---

[4] Upon information and belief, at least one additional parcel remains to be developed adjacent to or near the Site.

102.    The former wetlands and streams at the Site were "waters of the United States" within the meaning of the CWA and the regulations promulgated thereunder.

103.    The mechanized equipment and/or earth-moving equipment constituted "point sources" as defined in CWA Section 502(14), 33 U.S.C. § 1362(14).

104.    The discharges of dredged and/or fill material described herein constituted discharges of a pollutant within the meaning of CWA Section 301, 33 U.S.C. § 1311, and CWA Section 502(12), 33 U.S.C. § 1362(12).

105.    Defendants' activities were not authorized by a permit issued by the Corps pursuant to CWA Section 404(a), 33 U.S.C. § 1344(a).

106.    The discharges of dredged and/or fill material described herein violated and continue to violate CWA Section 301(a), 33 U.S.C. § 1311(a).

107.    Unless enjoined, Defendants and/or persons acting on their behalf, or with Defendants' consent and/or knowledge, are likely to continue to discharge dredged and/or fill material into, and/or to allow dredged and/or fill material to remain in, waters of the United States in violation of CWA Section 301, 33 U.S.C. § 1311.

108.    Pursuant to CWA Section 309(b) and (d), 33 U.S.C. §§ 1319(b) and (d), the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015, 28 U.S.C. § 2461, Defendants are liable for injunctive relief and civil penalties of up to $37,500 per day for each such violation of CWA Section 301(a), 33 U.S.C. § 1311(a) which takes place after January 12, 2009 through November 2, 2015, inclusive; $51,570 per day for each violation of CWA Section 301(a), 33 U.S.C. § 1311(a) occurring on or after November 2, 2015 and assessed on or after August 1, 2015 through January 14, 2017, inclusive; $52,414 per day for each violation of CWA Section 301(a), 33

21

U.S.C. § 1311(a) occurring on or after November 2, 2015 and assessed on or after January 15, 2017 through January 14, 2018, inclusive; and $53,484 per day for each violation of CWA Section 301(a), 33 U.S.C. § 1311(a) occurring on or after November 2, 2015, and assessed after January 15, 2018.

PRAYER FOR RELIEF

WHEREFORE, the United States of America respectfully requests that this Court:

A.      Order Defendants to comply with the terms of the CWA and the conditions of the applicable General Permits at its construction sites by requiring, among other things, the development and implementation of appropriate storm water pollution prevention plans, the application of BMPs to minimize or eliminate discharges of pollutants from their sites, and the designation of individuals tasked with assuring compliance with the applicable General Permits and the CWA;

B.      Permanently enjoin Defendants from discharging or causing the discharge of dredged or fill material or other pollutants into any water of the United States except in compliance with a CWA permit;

C.      Order Defendants to undertake measures, at Defendants' own expense and at the direction of EPA and/or the United States Army Corps of Engineers, to effect complete restoration of waters of the United States at the Site and to conduct on-site and off-site mitigation for unauthorized impacts to waters of the United States, as appropriate;

D.      Order Defendants to pay civil penalties, pursuant to CWA Section 309(d), 33 U.S.C. § 1319(d), for each day of each violation of CWA Section 301(a), 33 U.S.C. § 1311(a);

E.      Award the United States its costs and disbursements in this action; and

F.      Grant any such further relief as this Court deems just and proper.

22

Respectfully submitted,

_____

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

_____

RACHAEL AMY KAMONS
ANGELA MO
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington DC 20044
Telephone: (202) 514-5260 (Kamons)
Telephone: (202) 514-1707 (Mo)
Facsimile: (202) 616-2427
rachael.kamons@usdoj.gov
angela.mo@usdoj.gov

_____

PAUL CIRINO
Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington DC 20044
Telephone: (202) 514-1542
Facsimile: (202) 514-8865
paul.cirino@usdoj.gov

Of Counsel:
MICHELE WETHERINGTON
Associate Regional Counsel
U.S. EPA Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960
Telephone: (404) 562-9613

ANDREW CHERRY
Attorney – Advisor
U.S. EPA OECA – OCE – Water Enforcement Division
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Telephone: (202) 564-2589

KRISTIN BUTERBAUGH
Attorney-Advisor
U.S. EPA OECA – OCE – Water Enforcement Division
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Telephone: (202) 564-4479